**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,

      Debtor.

_____/

MICHAEL GOLDBERG, as Chapter 11 Trustee
of the estate of Debtor, The Center for
Special Needs Trust Administration, Inc.,

        Plaintiffs,

v.

BOSTON FINANCE GROUP, LLC, a Florida
limited liability company and LEO J. GOVONI,
an individual,

        Defendants.

_____/

Case No: 8:24-bk-00676-RCT

Chapter 11

Adv. Pro. No. 8:24-ap-00139-RCT

**BOSTON FINANCE GROUP, LLC'S ANSWER TO**
**PLAINTIFF'S COMPLAINT FOR DAMAGES AND OTHER RELIEF**

      Defendant, Boston Finance Group, LLC, a Florida limited liability company ("BFG"), by

and through its undersigned counsel, files this Answer to Plaintiff's, Michael Goldberg, as Chapter

11 Trustee of the estate of Debtor, The Center for Special Needs Trust Administration, Inc. (the

"Trustee"), Complaint for Damages and Other Relief (Doc. 1) (the "Complaint"), and states as

follows:

1

## THE PARTIES

1.      The Debtor is a corporation organized under the laws of the State of Florida on December 8, 2000 and maintains a principal office at 12425 28th St., Suite 301, St. Petersburg, FL 33716.

**ANSWER:**  Admitted only that the Debtor is a corporation organized under the laws of the State of Florida on December 8, 2000; without knowledge, therefore denied as to the remaining allegations of this paragraph.

2.      The Chapter 11 Trustee is currently operating the Debtor's business pursuant to sections 1106 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and this Court's Order Directing the United States Trustee to Appoint a Chapter 11 Trustee (Doc. 93) and Order Approving Appointment of Chapter 11 Trustee (Doc. 109) (collectively, the "Appointment Orders").

**ANSWER:**  Admitted that the respective Appointment Orders (Doc. 93 and Doc. 109) speak for themselves; otherwise, without knowledge, therefore denied.

3.      BFG is a Florida limited liability company that maintains a principal office at 12707 49th Street N., Suite 900, Clearwater, FL 33762.

**ANSWER:**  Admitted.

4.      Govoni is an individual who resides in Pinellas County, Florida and was the founder of the Debtor.

**ANSWER:**  Admitted Leo J. Govoni ("Govoni") is a resident of Pinellas County, Florida and that he is a co-founder of the Debtor.

<u>**JURISDICTION AND VENUE**</u>

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

**ANSWER:**  Admitted for jurisdictional purposes only.

6.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H), and (O), and the Chapter 11 Trustee consents to the entry of final orders and judgment by the Bankruptcy Court.

**ANSWER:**  Admitted for jurisdictional purposes only.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**ANSWER:**  Admitted as to venue.

<u>**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**</u>

**I.      Procedural History**

8.      On February 9, 2024 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of title 11 of the United States Code.

**ANSWER:**  Admitted as to the filing of a voluntary petition as it appears on the docket for case number 8:24-bk-00676-RCT (Doc. 1), otherwise without knowledge and therefore denied.

9.      On March 8, 2024, the U.S. Trustee filed an Expedited Motion for Order Directing the United States Trustee to Appoint a Chapter 11 Trustee by Agreement of the Debtor (Doc. 88). The Court granted the U.S. Trustee's Motion by Order dated March 11, 2024 (Doc. 93).

**ANSWER:**  Admitted that the Motion (Doc. 88) and Order (Doc. 93) speak for themselves.

10.      On March 21, 2024, the Court entered its Order Approving Appointment of Chapter 11 Trustee, appointing Michael Goldberg as Chapter 11 Trustee (Doc. 109).

**ANSWER:**  Admitted that the Order (Doc. 109) speaks for itself.

II.      **Background**

A.      **The Debtor's Business**

11.      The Debtor is a 501(c)(3) non-profit Florida corporation that provides comprehensive trust services for beneficiaries and their representatives related to the formation and administration of Special Needs Trusts ("SNT").

**ANSWER:**  Admitted Debtor is a Florida corporation; otherwise, without knowledge, therefore denied.

12.      The term "Special Needs Trust" encompasses a variety of specialized trusts used for special needs planning, which are often funded from settlements or recoveries from catastrophic personal injury lawsuits. While the various types of trusts under the SNT umbrella have some key differences, the primary purpose of an SNT is to allow someone who receives means-tested public assistance benefits like Supplemental Security Income and Medicaid to also receive the benefit of distributions from their SNT, such as payment for beneficiary expenses.

**ANSWER:**  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.      Since its founding, the Debtor grew to be one of the largest administrators of SNTs in the country, with beneficiaries (the "Beneficiaries") located in almost every state as well as beneficiaries who are located internationally.

**ANSWER:**  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13.

14.      As of the Petition Date, the Debtor administered over 2,000 SNTs (the "Trusts"). Each Beneficiary has his or her own trust account or sub-trust account (a "Trust Account") that reflects the specific assets in the respective Beneficiary's Trust, or in the case of a pooled Trust,

the specific assets allocated to the Beneficiary's sub-trust account. Other than the purported Loan (as defined below), the Trust investments are managed by different financial advisory companies, not the Debtor itself.

**ANSWER:**  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14.

15.    The Debtor's primary service as trustee of the Trusts is to manage the Trusts, maintain records for assets managed by third-party investment managers, respond to requests for distributions from Beneficiaries, and make distributions in a manner that still ensures that the applicable beneficiary meets the income and asset thresholds to qualify for public assistance benefits.

**ANSWER:**  Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15.

**B.    Govoni's relationship to the Debtor**

16.    Govoni, a purported financial and investment advisor, founded the Debtor with the assistance of his business colleague John Staunton ("Staunton"), a Pinellas County-based trusts and estates attorney.

**ANSWER:**  Admitted that Govoni and Staunton are co-founders of the Debtor; otherwise, denied.

17.    Following the Debtor's founding in December 2000, Govoni, for all practical purposes, controlled the Debtor's activities and operations for nearly 20 years.

**ANSWER:**  Denied.

18.    Govoni served on the Debtor's Board of Directors from the company's founding until his resignation in 2008 or early to mid-2009.

**ANSWER:**  Admitted.

19.     Govoni resigned from the Debtor's Board of Directors shortly before the Debtor made the first transfer of funds pursuant to the loan to BFG.

**ANSWER**:  Admitted that any funds paid were made after Govoni's resignation; otherwise, without knowledge as to the date the first transfer of funds were made and therefore denied.

20.     However, following his resignation, Govoni continued to control and exert his influence over the Debtor's operations and finances.

**ANSWER**:  Denied.

21.     The Debtor discovered that between 2009 and 2020, numerous transfers were made to BFG totaling approximately $100 million.

**ANSWER**:  Denied.

22.     The funds utilized to make these transfers were taken from over 1,000 Trusts managed by the Debtor and the transfers were documented as a purported loan from the Debtor to BFG.

**ANSWER**:  Admitted that Debtor loaned funds to BFG pursuant to various properly executed Loan Agreements, which speak for themselves; otherwise, without knowledge as to the source of the funds Debtor loaned to BFG and therefore denied.

23.     The transfer of funds to BFG was documented as a purported loan from the Debtor to BFG.

**ANSWER**:  Admitted Exhibits A through N attached to this Complaint speak for themselves; otherwise denied.

24.     Govoni was able to cause the transfer of these funds to BFG through the control he maintained over various aspects of the Debtor, its finances, as well as its information technology ("IT") and human resources ("HR") infrastructure.

**ANSWER**:  Denied.

25.     Govoni's control over the Debtor's finances took two primary forms: (i) employees of the Debtor would knowingly or unknowingly assist Govoni in transferring funds from the Debtor to BFG; and (ii) control of outside entities that were responsible for key aspects of the Debtor's operations and financial reporting.

**ANSWER**:  Denied.

26.     First, to accomplish the transfer of funds, it appears Govoni relied on an employee by the name of Tracey Gregory ("Gregory").

**ANSWER**:  Denied.

27.     Gregory was employed by the Boston Settlement Group, another company owned and controlled by Govoni, although a portion of her salary was paid by the Debtor.

**ANSWER**:  Without knowledge, therefore denied.

28.     While Gregory was employed by Boston Settlement Group, she worked at the Debtor from 2008 until her resignation in 2020.

**ANSWER**:  Without knowledge, therefore denied.

29.     During her tenure with the Debtor, she was both a member of the Debtor's Board of Directors and the Debtor's accounting manager.

**ANSWER**:  Without knowledge, therefore denied.

30.     In her position, Gregory had full access and control over the Debtor's bank accounts and financial records.

**ANSWER**:  Without knowledge, therefore denied.

31.     Gregory – upon information and belief at the direction of Govoni – allowed the purported $100 million in loaned funds to be transferred from the Debtor to BFG.

**ANSWER:**  As to Gregory's actions, without knowledge, therefore denied; as to all other all allegations, denied.

32.    Govoni was able to prevent the Beneficiaries from becoming aware of the $100 million transfer and ensuing loan default by exercising control over the information and financial disclosures the Beneficiaries received.

**ANSWER:**  Denied.

33.    As a trustee for the SNT Trusts, the Debtor is required to furnish each Beneficiary with an accounting showing the receipts, disbursements, and inventory of his or her Trust, which must be provided at least once annually.

**ANSWER:**  Without knowledge, therefore denied.

34.    The Debtor retained the accounting firm Fiduciary Tax & Accounting Services, LLC ("FTAS"), which was purportedly owned by a John Witeck ("Witeck"), to provide all required annual trust accounting and the tax filing services for each Trust.

**ANSWER:**  Without knowledge, therefore denied.

35.    The Debtor relied on FTAS to provide Beneficiaries with the required annual accountings and paid FTAS approximately $650,000 annually for these services.

**ANSWER:**  Without knowledge, therefore denied.

36.    Govoni signed the electronic articles of organization for FTAS filed with the Florida Secretary of State.

**ANSWER:**  Admitted.

37.    Through its prepetition investigation, the Debtor confirmed that Govoni – not Witeck – does in fact own FTAS.

**ANSWER:**  Denied.

38.    In a lawsuit filed by a former beneficiary of a Trust administered by the Debtor, Witeck testified that Govoni created FTAS and currently holds a majority ownership interest in FTAS.

**ANSWER:**  Without knowledge, therefore denied.

39.    Witeck explained that Govoni gratuitously transferred a minority ownership interest in FTAS to Witeck shortly after FTAS's formation.

**ANSWER:**  Without knowledge, therefore denied.

40.    According to Witeck, FTAS has prepared the trust accountings for the Debtor since FTAS's founding, and 95% of FTAS's work comes from the Debtor.

**ANSWER:**  Without knowledge, therefore denied.

41.    Based on these facts, it is believed that Govoni formed FTAS and retained Witeck to prepare the required trust accountings specifically to ensure that Govoni could control the financial disclosures to the Debtor's Beneficiaries and to further monetize his relationship with the Debtor.

**ANSWER:**  Denied.

42.    Govoni also controlled the company the Debtor hired and relied on for its IT and HR needs. After its founding, the Debtor contracted with Austin Colby Co. ("Austin Colby"), which is owned and operated by Govoni, to handle all of its IT and HR functions.

**ANSWER:**  Admitted that Govoni is a director of Austin Colby; admitted that Debtor and Austin Colby had a contractual relationship; otherwise, denied.

43.    Austin Colby only services entities affiliated with Govoni.

**ANSWER:**  Denied.

44.     Austin Colby controlled the Debtor's electronics, computer network, and records – including, importantly, employee access to any electronic systems and records.

**ANSWER:**  Admitted that Austin Colby provided hardware and network services to Debtor; otherwise, denied.

45.     With respect to the Debtor's HR, Austin Colby's services were comprehensive.

**ANSWER:**  Admitted that Austin Colby provided certain specific HR services to Debtor; otherwise, denied.

46.     The Debtor's employees were at times employees of Austin Colby that were leased to the Debtor.

**ANSWER:**  Admitted that certain individuals who worked at the Debtor were employees of Austin Colby; otherwise, denied.

47.     At other times, the same employees were listed as employees of the Debtor.

**ANSWER:**  Admitted that certain individuals who worked at the Debtor were employees of Austin Colby; otherwise, denied.

48.     Austin Colby controlled the Debtor's payroll processing and had control over the Debtor's payroll account.

**ANSWER:**  Austin Colby provided payroll administrative services for Debtor; otherwise, denied.

49.     This control allowed Govoni to control the hiring and firing of the Debtor's employees and facilitated the placement of trusted individuals in key positions of authority, including both Gregory and Caitlin Janicki ("Janicki"), Govoni's daughter and former head of case management and vice president of the Center.

**ANSWER:**  Denied.

**C.    The 2009 $15 Million Loans**[1]

50.    On or about June 1, 2009, BFG entered into a Revolving Line of Credit Agreement with the Debtor (the "June 2009 Loan Agreement"), a copy of which is attached as Exhibit A. The June 2009 Loan Agreement provided for a revolving line of credit loan to be made by the Debtor to BFG in the maximum principal amount of $2.5 million.

**ANSWER:**  Admitted that the June 2009 Loan Agreement attached as Exhibit A to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the June 2009 Loan Agreement.

51.    Notably, the "notice" address for BFG and the Debtor in the 2009 Loan Agreement is identical.

**ANSWER:**  Admitted that the June 2009 Loan Agreement attached as Exhibit A to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the June 2009 Loan Agreement.

52.    Also on June 1, 2009, BFG executed and delivered a promissory note in the original principal amount of $2,500,000 (the "June 2009 Note"), a copy of which is attached as Exhibit B.

**ANSWER:**  Admitted that the June 2009 Note attached as Exhibit B to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the June 2009 Note.

53.    To secure the loan made by the Debtor, BFG and the Debtor executed a Security Agreement (the "Security Agreement") granting the Debtor a security interest in all of BFG's real and personal property. A copy of the Security Agreement is attached as Exhibit C.

---

[1] As a point of clarification, there was one 2009 $15 Million Loan, not multiple Loan**s**.

**ANSWER:** Admitted that the Security Agreement attached as Exhibit C to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Security Agreement.

54.     On June 1, 2009, BFG also executed a Negative Pledge Agreement (the "Pledge Agreement") agreeing not to encumber any of its assets pledged as collateral under the Security Agreement without the Debtor's consent. A copy of the Pledge Agreement is attached as Exhibit D.

**ANSWER:** Admitted that the Pledge Agreement attached as Exhibit D to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Pledge Agreement.

55.     On December 1, 2009, the Debtor and BFG entered into an Amended and Restated Revolving Line of Credit Agreement (the "December 2009 Loan Agreement"), a copy of which is attached as Exhibit E. The December 2009 Loan Agreement increased the maximum amount of the line of credit loan from the Debtor to $15 million.

**ANSWER:** Admitted that the December 2009 Loan Agreement attached as Exhibit E to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the December 2009 Loan Agreement.

56.     Again, the "notice" addresses for BFG and the Debtor in the December 2009 Loan Agreement are identical.

**ANSWER:** Admitted that the December 2009 Loan Agreement attached as Exhibit E to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the December 2009 Loan Agreement.

57.    The December 2009 Loan Agreement also provided that the Security Agreement and Pledge Agreement would continue to secure the additional amount loaned under the December 2009 Loan Agreement.

**ANSWER:**  Admitted that the December 2009 Loan Agreement attached as Exhibit E to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the December 2009 Loan Agreement.

58.    Also on December 1, 2009, BFG executed and delivered a promissory note in the original principal amount of $15,000,000 (the "December 2009 Note"), a copy of which is attached as Exhibit F. Again, the "notice" addresses for BFG and the Debtor in the December 2009 Note are identical.

**ANSWER:**  Admitted that the December 2009 Note attached as Exhibit F to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the December 2009 Note.

### D.    The 2020 $30 Million Loan

59.    On March 15, 2010, the Debtor and BFG entered into an Amended and Restated Revolving Line of Credit Agreement (the "2010 Loan Agreement"), a copy of which is attached as Exhibit G. The 2010 Loan Agreement increased the maximum amount of the line of credit loan from the Debtor to $30 million.

**ANSWER:**  Admitted that the 2010 Loan Agreement attached as Exhibit G to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2010 Loan Agreement.

60.    Again, the "notice" address for BFG and the Debtor in the 2010 Loan Agreement is identical.

**ANSWER:**  Admitted that the 2010 Loan Agreement attached as Exhibit G to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2010 Loan Agreement.

61.    Also on March 15, 2010, BFG executed and delivered a promissory note in the original principal amount of $30,000,000 (the "2010 Note"), a copy of which is attached as Exhibit H. Again, the "notice" addresses for BFG and the Debtor in the 2010 Note are identical.

**ANSWER:**  Admitted that the 2010 Note attached as Exhibit H to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2010 Note.

62.    The 2010 Note was signed by Govoni as "managing member" of BFG. The signature on the 2010 Note also matches the signatures on the June 2009 Note and December 2009 Note, so it is presumed that Govoni also signed those notes on behalf of BFG.

**ANSWER:**  Admitted.

### 5.    The 2011 $50 Million Loan

63.    On March 15, 2011, the Debtor and BFG entered into yet another Amended and Restated Revolving Line of Credit Agreement (the "2011 Loan Agreement"), a copy of which is attached as Exhibit I. The 2011 Loan Agreement increased the maximum amount of the line of credit loan from the Debtor to $50 million.

**ANSWER:**  Admitted that the 2011 Loan Agreement attached as Exhibit I to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2011 Loan Agreement.

64.    Again, the "notice" addresses for BFG and the Debtor in the 2011 Loan Agreement are identical.

**ANSWER:** Admitted that the 2011 Loan Agreement attached as Exhibit I to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2011 Loan Agreement.

65.     Also on March 15, 2011, BFG executed and delivered a promissory note in the original principal amount of $50,000,000 (the "March 2011 Note"), a copy of which is attached as Exhibit J. Again, the "notice" addresses for BFG and the Debtor in the March 2011 Note are identical.

**ANSWER:** Admitted that the March 2011 Note attached as Exhibit J to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the March 2011 Note.

66.     The March 2011 Note was signed by Govoni as "managing member" of BFG.

**ANSWER:** Admitted.

67.     On August 31, 2011, BFG sent a letter to the Debtor requesting that the terms of the loan be amended to change the variable interest rate on the loan from the Prime rate to the Five Year Treasury rate and that the interest rate be adjusted on a monthly basis. A copy of the August 31, 2011 letter is attached as Exhibit K.

**ANSWER:** Admitted that the August 31, 2011 letter attached as Exhibit K to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of Exhibit K.

68.     The very next day, on September 1, 2011, BFG executed and delivered an Amended and Restated Promissory Note (the "September 2011 Note") in the same principal amount of $50 million, but with the requested changes in the interest rate and adjustment of the interest rate. A copy of the September 2011 Note is attached as Exhibit L.

**ANSWER:**  Admitted that the September 2011 Note attached as Exhibit L to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the September 2011 Note.

69.    The September 2011 Note was signed by Govoni as managing member of BFG.

**ANSWER:**  Admitted.

### E.    The 2012 $100 Million Loan

70.    On January 1, 2012, the Debtor and BFG entered into an Amended and Restated Revolving Line of Credit Agreement (the "2012 Loan Agreement"), a copy of which is attached as Exhibit M. The 2011 Loan Agreement increased the maximum amount of the line of credit loan from the Debtor to $100 million.

**ANSWER:**  Admitted that the 2012 Loan Agreement attached as Exhibit M to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2012 Loan Agreement.

71.    Again, the "notice" addresses for BFG and the Debtor in the 2011 Loan Agreement are identical.

**ANSWER:**  Admitted that the 2012 Loan Agreement attached as Exhibit M to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2012 Loan Agreement.

72.    Also on January 1, 2012, BFG executed and delivered an Amended and Restated Promissory Note in the original principal amount of $100,000,000 (the "2012 Note"), a copy of which is attached as Exhibit N. Again, the "notice" addresses for BFG and the Debtor in the 2012 Note are identical.

**ANSWER:**  Admitted that the 2012 Note attached as Exhibit N to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2012 Note.

73.     The 2012 Note matured on January 1, 2017.

**ANSWER:**  Admitted that the 2012 Note attached as Exhibit N to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the 2012 Note.

74.     In connection with the 2012 Loan Agreement and 2012 Note, Govoni executed a Personal Guaranty (the "Guaranty") by which Govoni personally guaranteed all amounts due under the 2012 Note. A copy of the Guaranty is attached as Exhibit O.

**ANSWER:**  Admitted that the Guaranty attached as Exhibit O to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Guaranty.

75.     The June 2009 Loan Agreement, the June 2009 Note, the Security Agreement, the Negative Pledge Agreement, the December 2009 Loan Agreement, the December 2009 Note, the 2010 Loan Agreement, the 2010 Note, the 2011 Loan Agreement, the March 2011 Note, the September 2011 Note, the 2012 Loan Agreement, the 2012 Note, and the Guaranty are collectively referred to as the "Loan Documents" and the loan made pursuant to the Loan Documents is referred to as the "Loan."

**ANSWER:**  Admitted that the June 2009 Loan Agreement, the June 2009 Note, the Security Agreement, the Pledge Agreement, the December 2009 Loan Agreement, the December 2009 Note, the 2010 Loan Agreement, the 2010 Note, the 2011 Loan Agreement, the March 2011 Note, the September 2011 Note, the 2012 Loan Agreement, the 2012 Note, and the Guaranty, which are

collectively referred to in the Complaint as the "Loan Documents" speak for themselves; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Loan Documents.

**F.    The Loan**

76.    The amounts loaned by the Debtor were taken from the Trust Accounts for the Trusts it managed without authorization from the Beneficiaries. In some cases, funds were transferred directly from bank and brokerage accounts held in the name of the Trusts to BFG.

**ANSWER:**  Without knowledge, therefore denied.

77.    Despite the fact that the 2012 Note matured on January 1, 2017, the Debtor continued to transfer funds to BFG through and including 2020.

**ANSWER:**  Admitted that the 2012 Loan Agreement attached as Exhibit M to the Complaint speaks for itself; otherwise denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 77.

**G.    Default by BFG and Amounts Owed**

78.    BFG only made a few periodic interest payments on the Loan over the years and did not pay the full amount due under the Loan Documents by the maturity date of January 1, 2017.

**ANSWER:**  Admitted that BFG made interest payments on the Loan; admitted that BFG did not pay the full amount due under the Loan Documents by the maturity date of January 1, 2017; otherwise, denied.

79.    However, BFG continued to make some payments after the Loan matured with the last payment having been made on October 27, 2023.

**ANSWER:** Admitted that BFG made payments after the Loan matured; denied that the last payment made was October 27, 2023; otherwise, denied.

80.     Prepetition, the Debtor retained counsel to investigate and collect the Loan to BFG. On September 8, 2023, the Debtor's counsel sent a demand letter (the "Demand Letter") to BFG and Govoni providing notice of the default under the Loan Documents and demanding payment within five (5) days. A copy of the Demand Letter is attached as Exhibit P.

**ANSWER:** Admitted that the purported Demand Letter attached as Exhibit P to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of Exhibit P.

81.     The Loan Documents are in default for BFG's failure to pay the full amount of the principal, interest and other amounts due under the Loan Documents by the maturity date of January 1, 2017.

**ANSWER:** Admitted.

82.     As of April 23, 2024, the Debtor is owed a total of $142,283,314 which includes $100,000,000 in principal and $42,283,314 in interest, together with interest which continues to accrue.

**ANSWER:** Without knowledge, therefore denied.

83.     Pursuant to the Appointment Orders, the Chapter 11 Trustee is the duly authorized fiduciary on behalf of the Debtor.

**ANSWER:** Admitted that the respective Appointment Orders (Doc. 93 and Doc. 109) speak for themselves; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Appointment Orders.

84.     To the extent necessary, the Chapter 11 Trustee hereby demands payment of all amounts due under the Loan Documents.

**ANSWER:**  Without knowledge, therefore denied.

85.     The Chapter 11 Trustee has performed all conditions precedent to bringing this action, or any such conditions have been waived.

**ANSWER:**  Admitted.

86.     The Loan Documents provide that BFG shall pay attorneys' fees and costs incurred in collecting the Loan.

**ANSWER:**  Admitted in that the Loan Documents attached to the Complaint speak for themselves; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of any of the Loan Documents.

## COUNT I
## ACTION FOR DAMAGES FOR BREACH OF THE NOTES

87.     The Chapter 11 Trustee repeats and realleges paragraphs 1-86 above as if fully set forth herein.

**ANSWER:**  BFG repeats and realleges its responses to paragraphs 1 through 86.

88.     This is an action for damages against BFG.[2]

**ANSWER:**   Admitted that The Trustee purports to bring an action for damages against BFG; otherwise denied.

---

[2] While the Chapter 11 Trustee is only pursuing claims against BFG and Govoni for breach of the Loan Documents at this time, the Chapter 11 Trustee believes that BFG and Govoni may have acted tortiously and specifically reserves the right, upon completion of his investigation and discovery, to assert any additional claims for relief against the BFG and Govoni, including, but not limited to, fraud and breach of fiduciary duty, and to add additional defendants which he may identify, including, but not limited to, other entities owned and/or controlled by Govoni via substantive consolidation, adverse domination, veil piecing, alter ego, or any other theory as allowed by law or equity. In addition to the outstanding amount due under the Loan, the Chapter 11 Trustee reserves the right to seek the recovery of any additional losses incurred by the Debtor because, as he understands, tens of millions of dollars of additional funds earned from administering the SNT Trusts may be missing from the estate.

89.    The Debtor owns and holds the Loan Documents.

**ANSWER**:  Without knowledge, therefore denied.

90.    BFG has defaulted under the terms of the Loan Documents by failing to make payments when due and failing to pay the full amount owed by the 2012 Note maturity date.

**ANSWER**:  Admitted.

91.    The Debtor has been damaged by BFG's breach of the Loan Documents.

**ANSWER**:  Without knowledge, therefore denied.

92.    As of April 23, 2024, the Debtor is owed a total of $142,283,314 which includes $100,000,000 in principal and $42,283,314 in interest, together with interest which continues to accrue.

**ANSWER**:  Without knowledge, therefore denied.

**COUNT II**
**ACTION FOR DAMAGES FOR BREACH OF THE GUARANTY**

Count II is not directed at BFG and therefore, no answer by BFG is required to paragraphs 93 through 97.

**COUNT III**
**ACTION FOR FORECLOSURE OF PERSONAL PROPERTY**

98.    The Chapter 11 Trustee repeats and realleges paragraphs 1-86 above as if fully set forth herein.

**ANSWER**:  BFG repeats and realleges its responses to paragraphs 1 through 86.

99.    This is an action for foreclosure of a security interest in personal property.

**ANSWER**:  Admitted that the Trustee purports to bring an action to foreclosure a security interest in personal property; otherwise denied.

100.    Through the Security Agreement, BFG granted the Debtor a security interest in all of BFG's "right, title and interest in all property, real and personal, owned by Debtor on the Effective Date or thereafter acquired by the Debtor on or prior to payment in full and satisfaction of all obligations of Debtor to the Center under the Loan Documents" (the "Collateral Personal Property").

**ANSWER:**  Admitted in that the Security Agreement attached as Exhibit C to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Security Agreement.

101.    BFG may claim an interest in the Collateral Personal Property but such right, title, or interest, if any, is inferior to and subordinate to the Debtor's security interest in the Collateral Personal Property.

**ANSWER:**  Admitted in that the Security Agreement attached as Exhibit C to the Complaint speaks for itself; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Security Agreement.

102.    The Debtor owns and holds the Loan Documents.

**ANSWER:**  Without knowledge, therefore denied.

103.    The Debtor possesses a security interest in the Collateral Personal Property by virtue of the Loan Documents.

**ANSWER:**  Admitted in that the Security Agreement attached as Exhibit C to the Complaint and the Loan Documents attached as Exhibits A through O speak for themselves; denied to the extent that the allegations of this paragraph are inconsistent with or mischaracterize the contents of the Security Agreement or the Loan Documents.

104.    The Loan Documents are in default.

**ANSWER:**  Admitted.

105.    The Debtor has been damaged by the default of the Loan Documents.

**ANSWER:**  Without knowledge, therefore denied.

106.    As of April 23, 2024, the Debtor is owed a total of $142,283,314 which includes $100,000,000 in principal and $42,283,314 in interest, together with interest which continues to accrue.

**ANSWER:**  Without knowledge, therefore denied.

**COUNT IV**
**ACTION FOR TURNOVER OF PROPERTY TO THE**
**BANKRUPTCY ESTATE AND FOR AN ACCOUNTING**
**(Boston Finance Group, LLC)**

107.    The Chapter 11 Trustee repeats and realleges paragraphs 1-86 above as if fully set forth herein.

**ANSWER:**  BFG repeats and realleges its responses to paragraphs 1 through 86.

108.    This is an action for turnover of property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542, as well as an accounting in connection therewith.

**ANSWER:**  Admitted that the Trustee purports to bring an action for turnover of property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542 and an accounting; otherwise denied.

109.    The funds loaned by the Debtor to BFG that have not been repaid by BFG constitute property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541.

**ANSWER:**  The allegations of this paragraph constitute a legal conclusion to which no response is required. To the extent that a response is required, denied.

110.    The Chapter 11 Trustee is entitled to the immediate turnover of such property and to an accounting in regard to such property.

**ANSWER:**  The allegations of this paragraph constitute a legal conclusion to which no response is required. To the extent that a response is required, denied.

**COUNT V**
**ACTION FOR TURNOVER OF PROPERTY TO THE**
**BANKRUPTCY ESTATE AND FOR AN ACCOUNTING**
**(Leo J. Govoni)**

Count V is not directed at BFG and therefore, no answer by BFG is required to paragraphs 111 through 115.

Responding to the un-numbered **WHEREFORE** paragraphs following paragraphs 92, 106, and 110 of the Complaint, BFG denies that the Trustee is entitled to the specific relief requested against BFG.

**GENERAL DENIAL**

Any allegation in the Complaint that has not been expressly admitted, denied, or otherwise controverted is denied.

Dated: June 7, 2024.

*/s/ Lara Roeske Fernandez*
LARA ROESKE FERNANDEZ
Florida Bar No. 0088500
lfernandez@trenam.com
ERIC S. KOENIG
Florida Bar No. 16693
ekoenig@trenam.com
WILLIAM A. MCBRIDE
Florida Bar No. 112081
bmcbride@trenam.com

TRENAM, KEMKER, SCHARF, BARKIN,
FRYE, O'NEILL & MULLIS, P.A.
101 E. Kennedy Boulevard, Suite 2700
Tampa, Florida 33602
Tel: (813) 223-7474

*Counsel for Boston Finance Group, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 7, 2024, a true and correct copy of the foregoing was

served to all parties receiving CM/ECF notification via the Court's CM/ECF system.

*/s/ Lara Roeske Fernandez*
Attorney