ORDERED.

**Dated: May 05, 2025**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:
The Center for Special Needs Trust Administration,
Debtor.

Case No. 8:24-bk-00676-RCT

Chapter 11

Michael Goldberg, as Chapter 11 Trustee of the estate of Debtor, The Center for Special Needs Trust Administration,
Plaintiff,
v.

Adv. Pro. 8:24-ap-00139-RCT

Boston Finance Group, LLC and Leo J. Govoni,
Defendants.
/

**ORDER (I) FINDING BOSTON FINANCE GROUP, LLC AND LEO J. GOVONI IN CONTEMPT AND (II) GRANTING THE TRUSTEE'S EMERGENCY MOTION FOR SANCTIONS**

On May 2, 2025, this Court held a hearing on two matters: (1) this Court's Order to Show Cause directed at Boston Finance Group, LLC and Leo J. Govoni (Doc. 112), and (2) the Chapter 11 Trustee's Emergency Motion for Sanctions (Doc. 113), to which Govoni filed a response (Doc. 116). For the reasons set forth below, the Court finds Govoni, individually and on behalf of Boston Finance Group, LLC, in contempt. Additionally, the Court grants the Chapter 11 Trustee's Emergency Motion for Sanctions (Doc. 113).

**I. Background**

    Debtor The Center for Special Needs Trust Administration, Inc. served as the trustee or co-trustee of numerous special needs trusts ("SNTs") for over 2,000 beneficiaries who suffer from various levels of disability. Debtor's primary duties as trustee of the SNTs included managing the SNTs and maintaining records for assets managed by third-party investment managers.

    Before filing the Chapter 11 bankruptcy petition on February 9, 2024, Debtor's leadership discovered that Debtor had "loaned" approximately $100 million over fifteen years to a third-party, Boston Finance Group, LLC ("BFG"), and that the loan was in default. BFG is a company controlled by Debtor's founder, Leo Govoni ("Govoni").

    On March 21, 2024, Michael Goldberg was appointed as the Chapter 11 Trustee of Debtor's estate. Thereafter, the Trustee filed this adversary proceeding against BFG and Govoni for breach of the loan documents.[1] The Trustee moved for summary judgment, and the parties stipulated to the following facts supporting an agreed order for partial summary judgment: (1) BFG entered into a revolving line of credit that was reflected by the loan documents; (2) Govoni executed a personal guaranty for all amounts due under the loan documents; (3) the loan matured on January 1, 2017; and (4) BFG and Govoni are in default of the loan documents.[2] As a result, on August 20, 2024, the Court granted summary judgment as to liability for breach of the loan documents by BFG (Count I) and breach of the guaranty by Govoni (Count II).[3] Thereafter, on January 13, 2025, the Court entered summary judgment on the issue of damages, specifically finding that BFG and Govoni were liable for $120,324,391.07 in damages on Counts I and II of the adversary complaint.[4]

---

[1] Doc. 1.
[2] Doc. 20.
[3] Doc. 20.
[4] Docs. 44, 51, 52.

On January 10, 2025, the Trustee moved for a temporary restraining, arguing that there was a substantial likelihood that, absent a temporary restraining order, Govoni, BFG, and their associates would otherwise transfer or dissipate assets (including the assets of the Alter Ego Entities) purchased with estate funds.[5] This Court granted the motion, enjoining BFG and Govoni, as well as anyone acting on their behalf or in concert or participation with them, from directly or indirectly encumbering, liquidating, transferring, spending, diminishing, or otherwise disbursing the assets of any of the Alter Ego Entities that were identified in the Order.[6] The Court later converted the temporary restraining order into a preliminary injunction.[7]

On March 10, 2025, the Court entered an agreed order granting the Trustee's Emergency Motion to Compel ("Agreed Order").[8] Pursuant to the Agreed Order, BFG and Govoni were directed to produce, by March 20, 2025, all documents in their possession, custody, or control that was responsive to the Rule 2004 Examination Subpoena *Duces Tecum* issued by the Trustee on September 6, 2024.[9] The Agreed Order specifically identified the documents that were sought and a deadline for production.[10] BFG and Govoni failed to comply with the Agreed Order.

On March 24, 2025, the Trustee filed an Emergency Motion for Sanctions, and this Court granted the motion on March 26, 2025, directing Govoni to comply and produce the documents set forth in the prior Agreed Order by March 30, 2025 ("Compliance Order").[11] In the Compliance Order, the Court warned that if Govoni failed to comply, the Court could enter an Order to Show Cause why he should not be held in contempt.[12] Govoni filed a response to the Compliance Order,

[5] Doc. 42.
[6] Docs. 45, 59.
[7] Docs. 61, 65, 122.
[8] Docs. 69, 71.
[9] Doc. 71.
[10] Doc. 71.
[11] Docs. 77, 81.
[12] Doc. 81.

stating that to comply, he would need access to the business premises, which he was barred from accessing pursuant to the Compliance Order.[13]

On April 2, 2025, the Trustee moved for an Order to Show Cause ("OTSC"), because Govoni still failed to comply with the Court's orders.[14] On April 4, 2025, the Court held a hearing on the Trustee's motion for an OTSC.[15] At the hearing, the Trustee questioned Govoni about his ownership interests in some of the Alter Ego Entities. Thereafter, the Court determined that the hearing should be continued to April 18, 2025, to allow Govoni to access the business premises to locate and produce the requested documents.[16]

After the April 18, 2025, hearing, the Court granted in part the Trustee's motion for an OTSC and directed Govoni to produce to the Trustee, by April 25, 2025, the fact information sheets and sworn financial statements for Govoni and BFG ("Preliminary OTSC").[17] The Court continued the April 18 hearing to April 25, and at the April 25, 2025, hearing, the Court ordered Govoni to produce to the Trustee, by April 28, 2025, the fact information sheets and sworn financial statements for Govoni and BFG (as required by the Preliminary OTSC).[18] Govoni produced nothing by the deadline in the Preliminary OTSC but the Court continued the April 25 hearing to April 28 to permit Govoni to work on the documents with his new counsel.

At the April 28, 2025, hearing, the Trustee informed the Court that BFG and Govoni still had not complied with the Agreed Order or the Compliance Order. Additionally, Govoni failed to disclose his various ownership interests in the Alter Ego Entities on his fact information sheet and sworn financial statements. As a result, the Court issued an Order to Show Cause directing Govoni and a representative of BFG to appear on May 2, 2025, to show cause why the Court should not

---

[13] Doc. 81, 83.
[14] Doc. 82.
[15] Doc. 98 is a transcript of the April 4, 2025, hearing.
[16] Doc. 98, p. 58.
[17] Doc. 104.
[18] Doc. 110.

hold them in contempt for their failure to comply with the Agreed Order and the Compliance Order.[19] The Court warned that failure to show cause could result in monetary sanctions, injunctive relief, issuing a writ of bodily attachment for Govoni, and referral of the matter to the district court for consideration of criminal contempt sanctions.[20]

On April 29, 2025, the Trustee filed another Emergency Motion for Sanctions with respect to Govoni's and certain Alter Ego Entities' failure to comply with the preliminary injunction by dissolving sixteen of the Alter Ego Entities.[21] Govoni filed a response, admitting that he had filed Articles of Dissolution for sixteen Alter Ego Entities.[22] The Court added the Trustee's second Emergency Motion for Sanctions to the May 2, 2025, contempt hearing.

**II. May 2, 2025, Contempt Hearing[23]**

The Trustee called three witnesses to testify at the contempt hearing—Govoni, Josh Rizack, and Glenn Genereux. The Trustee questioned Govoni regarding his attempts to comply with the Agreed Order, Compliance Order, and Preliminary OTSC. Govoni's responses could best be described as evasive and less than credible. He mostly feigned ignorance of his massive web of corporate entities and of significant transactions. However, Govoni admitted that he did not produce the documents sought in the Agreed Order and Compliance Order, and he did not make credible efforts to comply with them.

The Trustee asked Govoni about his responses on the fact information sheet. For example, he was asked whether he had "given, sold, loaned, or transferred any real or personal property worth more than $100 to any person in the last year."[24] Govoni had responded "No," but he

---

[19] Doc. 112.
[20] Doc. 112.
[21] Doc. 113.
[22] Doc. 116.
[23] The Exhibit List and exhibits are filed at Doc. 118, and all of the exhibits were admitted into evidence.
[24] Doc. 118-2, Exhibit 2.

admitted at the hearing that he had, in fact, paid more than $100 to Ora Fraze. Govoni also failed to disclose "The Govoni Trust - 2018" for which he is the Trustor, Trustee, and a beneficiary.[25]

Additionally, the Trustee asked Govoni about his response to the question on the fact information sheet asking him to "[d]escribe all other accounts or investments you may have, including stocks, mutual funds, savings bonds, or annuities."[26] When asked why he did not list any of his ownership interests in the Alter Ego Entities, Govoni stated that he was "confused" regarding how to fill the sheet out.

The Trustee compared a July 2024 draft of Govoni's personal financial statement[27] listing companies in which he had an ownership interest to his response on the fact information sheet[28] listing no companies. When asked about the discrepancy, Govoni evasively testified that he did not know what companies he had an interest in and that the Trustee would have to ask an individual named John Witeck to get that information. When asked whether Govoni attempted to contact Witeck to obtain the information, Govoni stated that Witeck would not speak to him, but he could not recall the last time he attempted to contact Witeck. Govoni's testimony on this point was not credible. On cross, Govoni stated that he had instructed his new counsel this past week to issue a subpoena to Witeck to obtain the information.

The Trustee asked Govoni about his April 2025 visit to the business premises to obtain documents responsive to the Agreed Order and Compliance Order. Govoni admitted that he was only there for approximately ten minutes and did not look for information on any computers or in any file cabinets or boxes. Govoni stated that John Golden might have some information or documentation responsive to the Agreed Order and Compliance Order, but Govoni could not state

---

[25] Doc. 118-7, Exhibit 7.
[26] Doc. 118-2, Exhibit 2.
[27] Doc. 118-3, Exhibit 3.
[28] Doc. 118- 2, Exhibit 2.

whether he had tried to obtain such information from Golden. On cross, Govoni stated that he had instructed his new counsel this past week to issue a subpoena to Golden to obtain the information.

The Trustee called Glenn Genereux, who is an accounting consultant that was hired by Chief Restructuring Officer William Long to work on accounting and management issues in connection with the Trustee's efforts to recover funds to apply towards the judgment. Genereux testified about Govoni's April 2025 visit to the business premises. Genereux testified that after Govoni arrived, Govoni quickly concluded that there were no documents there that were responsive to the Agreed Order and Compliance Order. Govoni did not even ask Genereux for any information beyond asking for QuickBooks access for BFG and Boston Asset Management, which Genereux did not have.

The Trustee asked Govoni about one of his companies, Boston Asset Management ("BAM"). In a disclosure statement required by the SEC, BAM stated that as of December 31, 2022, BAM had over $95 million in assets under its management.[29] The disclosure statement also emphasized that BAM's services were directed "primarily to trustees administering special needs and pooled trusts."[30] He conceded that Debtor used BAM to invest and manage the SNTs' money, but he feigned knowledge regarding the percent of BAM's clients that consisted of Debtor's SNTs. Govoni further testified that Brett Walrath had BAM's client list, but that most of BAM's clients had been transferred out of BAM and to a company operated by Govoni's brother after Debtor filed for bankruptcy. Govoni did not explain why he could not get information from his brother or Walrath to respond to the Trustee's discovery requests.

The Trustee next called John Rizack to testify. Rizack is the Chief Restructuring Officer for the Big Storm entities owned by Govoni. He was appointed by the Court to assist the Trustee's

[29] Doc. 118-16, Exhibit 16, p. 5 of 20.
[30] Doc. 118-16, Exhibit 16, p. 8 of 20.

post-judgment collection efforts. Rizack testified that after Govoni came to the business premises on March 26, 2025 (despite being barred from doing so in the Compliance Order), Rizack noticed that valuable commercial grade coffee machines and barrels of rum were missing. However, Rizack conceded at the hearing that he did not see who took the items, but the barrels of rum were returned due to a lack of paperwork for their improper transfer.

Most tellingly, the Trustee questioned Govoni about sales of real property by two of Govoni's companies—Artspace Properties LLC and Fat Lion Real Estate, LLC (both of which are Alter Ego Entities). Fat Lion sold property in June of 2024 and netted over $1 million, but Govoni could not tell the Court where any of those funds went.[31] Likewise, Artspace sold fifteen properties in 2023 and 2024 for over $2 million, but Govoni could not tell the Court where any of those sales proceeds went either.[32]

Additionally, in April of 2025, Govoni filed Articles of Dissolution with the Florida Department of State for sixteen of his companies, which are Alter Ego Entities.[33] This conduct clearly violated the Court's preliminary injunction that barred Govoni and the Alter Ego Entities from dissipating assets purchased with estate funds.[34]

Megan Murray, counsel for the Unsecured Creditors' Committee, proffered testimony regarding the effect of Govoni's failure to comply with the Court's orders on the SNT beneficiaries' lives. She spoke of one beneficiary that needs life-saving surgery, but that beneficiary lacks the critical expense funds that were taken from her SNT.

Another beneficiary is mentally disabled and in a mental health facility and is required to store all his possessions in a storage facility. He needs $200 quarterly to pay for the storage fee, and he calls Ms. Murray regularly about the missing funds, which he needs to pay the storage fee.

---

[31] Doc. 118-14, Exhibit 14, p. 20-24 of 65; Doc. 118-15, Exhibit 15.
[32] Doc. 118-14, Exhibit 14; Doc. 118-15, Exhibit 15.
[33] Doc. 118-12, Exhibit 12.
[34] Docs. 61, 65.

Murray proffered the testimony of two other beneficiaries that need the money that was taken to improve their quality of life. The proffers were admitted without objection. Thereafter, the Trustee closed its presentation by arguing that the evidence presented at the hearing clearly showed that Govoni stonewalls all discovery attempts to give him more time to dissipate assets before they are discovered by the Trustee.

**III. The Bankruptcy Court's Power to Sanction or Find Civil Contempt**

Discovery in aid of execution is authorized by Federal Rule of Civil Procedure 69(a)(2), as incorporated and applied to this proceeding by Federal Rule of Bankruptcy Procedure 7069. Rule 69(a)(2) states that a judgment creditor can obtain discovery in aid of execution "from any person . . . as provided in these rules or by the procedure of the state where the court is located." A bankruptcy court's authority to sanction for failure to comply with post-judgment discovery in aid of execution is well explained in the case of *In re Vaso Active Pharmaceuticals, Inc.*:[35]

> Under Rule 37 of the Federal Rule[s] of Civil Procedure, made applicable by the Federal Rule of Bankruptcy Procedure 7037, a court may issue further orders after a failure to obey an order to provide or permit discovery. . . . [This includes a finding of] contempt of court [for] the failure to obey any order . . . . While the type of sanction to issue for Rule 37 violations is committed to the "sound discretion" of the court, the sanction must be just, and must specifically relate to the claim or claims at issue within the discovery order. Further, when the court does impose sanctions, it is important that the court articulate the reasons for its decisions.
>
> Alternatively, 11 U.S.C. § 105 states that the court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." This provision "supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.". . . As a result, bankruptcy courts frequently find parties in civil contempt under the authority granted within this provision.
>
> * * *
>
> Sanctions for civil contempt can be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses

[35] 514 B.R. 416 (Bankr. D. Del. 2014).

> sustained. A [movant] must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order. The "clear and convincing" standard holds a heavy burden; where there is ground to doubt the wrongfulness of the conduct of the defendant, he should not be adjudged in contempt. Any ambiguity in the law should also be resolved in favor of the party charged with contempt. Lastly, parties should not be held in contempt unless the Court first gives fair warning that certain acts are forbidden. . . . [Civil sanctions must provide] the contemnor . . . the opportunity to purge the contempt, . . . [and courts should] "apply the least coercive sanction . . . reasonably calculated to win compliance with its orders." If compliance is not forthcoming, the initial penalty may be increased, or a new penalty appropriate under the circumstances may be selected.[36]

## IV. Finding of Civil Contempt in this Case

After hearing all the evidence and considering the record in this case, the Court finds that the Trustee has established the following by clear and convincing evidence—the Agreed Order, the Compliance Order, and the Preliminary OTSC are valid orders that Govoni and BFG had knowledge of,[37] and despite their knowledge, they disobeyed the orders. BFG and Govoni simply ignored this Court's orders to provide basic financial information and documents. Govoni's testimony before this Court was purposefully vague and less than credible.

To the extent that Govoni argues that he could not respond on behalf of BFG because the Court had barred him from the business premises, the argument fails and is not credible. First, Govoni was not barred from the business premises until the Court issued the Compliance Order on March 26, 2025.[38] However, the Trustee first subpoenaed the documents in September of 2024. Second, even after he was barred from the premises, the Court granted Govoni two separate opportunities to enter the premises for purposes of obtaining the information that he said he needed. Govoni squandered both opportunities and instead used both visits as an opportunity to gather his

[36] *Id.* at 421-23 (internal citations omitted).
[37] In fact, BFG and Govoni agreed to the Agreed Order.
[38] Doc. 81.

personal belongings. It is now obvious that Govoni was stalling for time. Third, Govoni was unable to articulate any specific efforts to obtain the requested documents and information.

The Agreed Order, dated March 10, 2025, was clear and specific. It was negotiated between Govoni's then-counsel and the Trustee. The documents were due ten days after entry of the Order, and the hearing on the Trustee's efforts to compel was canceled based on the Agreed Order. There was nothing confusing or ambiguous about the Agreed Order or with Govoni's willful refusal to comply.

A fact information sheet is something that is typically required of a judgment debtor. Here, it was specifically ordered by the Court.[39] It was due April 25, 2025. The deadline to produce the fact information sheets was ignored by both judgment debtors. Nevertheless, the Court extended the deadline over the weekend to give Govoni an opportunity to work on them with his new counsel. To date, BFG has yet to complete any fact information sheet. Govoni ostensibly provided a personal fact information sheet within 15 minutes of the Court's second deadline. The document he ultimately provided was not only worthless, but it was objectively false and misleading, despite being given under penalty of perjury and despite Govoni having been given extra time to review it with counsel.

Govoni also violated the preliminary injunction that was in place. He admits that he dissolved sixteen of the Alter Ego Entities subject to his control and subject to the preliminary injunction.[40]

BFG is a limited liability company, and as such, it can only act through its principals.[41] As such, Govoni, as BFG's principal, can be held in contempt for BFG's actions and failures to act:

> As the [Supreme] Court [has] explained: "A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ

[39] Doc. 104.
[40] Doc. 116
[41] *See PlayNation Play Systems, Inc. v. Velex Corporation,* 939 F.3d 1205, 1213 (11th Cir. 2019).

> directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt."[42]

Thus, Govoni, individually and as the principal of BFG and of the sixteen Alter Ego Entities that he administratively dissolved, is found to be in contempt of this Court's preliminary injunction and this Court's discovery orders.

Because of this contemptable conduct, starting May 3, 2025, Govoni will be assessed a sanction of $5,000 per day until all the documents directed to be produced under the Agreed Order and Compliance Order are produced. In addition, Govoni will be assessed, as a sanction, all the attorneys' fees and costs incurred by the Chapter 11 Trustee in connection with his efforts to obtain the documents. Also included in the sanction will be the Unsecured Creditors' Committee's fees and costs of monitoring and participating in the contempt proceedings. These fees and costs are intended to compensate the Trustee and the Committee for all the work that was necessary only because of Govoni's refusal to comply with this Court's orders.

The Court will hold a continued hearing on the Court's Order to Show Cause on May 12, 2025, at 2:00 p.m. If compliance with this Court's orders is not satisfactory by that time, the Court will issue a recommendation to the District Court that will request that the Reference be Withdrawn with respect to contempt proceedings against Govoni and BFG so that they can be handled by the District Court and criminal contempt can be considered.

Finally, with respect to the Trustee's second Emergency Motion for Sanctions, the Court grants the motion and finds that Govoni shall be responsible for reinstating all the dissolved corporate entities that the Trustee directs him to reinstate.

---

[42] *Id.* (quoting *United States v. Fleischman*, 339 U.S. 349, 357–58 (1950)).

**V. Conclusion**

Govoni has created a massive corporate web of investments and transactions. He is using the complexity of the web as a means of frustrating the Trustee's collection efforts. It is because of this complexity that the Trustee's efforts to obtain basic information necessary to execute on his judgment is so important and why the contemptable behavior of Govoni is so detrimental, not only to the collection efforts, but also to the administration of Debtor's bankruptcy estate and case. Having founded and worked with Debtor for years, Govoni, uniquely, has actual and specific knowledge of the vulnerability and special needs of the victims represented by the Trustee and the Unsecured Creditors' Committee. Govoni's contempt of this Court's orders is not only willful, but it is also knowingly intended to further injure the victims represented by the Trustee and the Unsecured Creditors' Committee.

Accordingly, it is ORDERED AND ADJUDGED that:

(1) The Court finds Govoni, individually and as the principal of BFG and of the sixteen Alter Ego Entities that he administratively dissolved, to be in contempt of this Court's preliminary injunction and this Court's discovery orders.

(2) Starting May 3, 2025, Govoni will be assessed a sanction of $5,000 per day until all the documents directed to be produced under the Agreed Order and Compliance Order are produced.

(3) Govoni will also be assessed, as a compensatory sanction, (a) all attorneys' fees and costs incurred by the Chapter 11 Trustee in connection with his efforts to obtain the documents; (b) the costs of work of the Court-appointed CROs in connection with these contempt proceedings; and (c) the attorneys' fees and costs of the Unsecured Creditors' Committee in monitoring and participating in the contempt proceedings. The Trustee and the Unsecured Creditors' Committee

are directed to file a declaration of fees and costs within 14 days after the entry of this order. Upon review of the declarations, the Court will enter a final order of contempt.

(4) The Court will hold a continued hearing on its Order to Show Cause on May 12, 2025, at 2:00 p.m., in Courtroom 8A of the Sam M. Gibbons U.S. Courthouse, located at 801 North Florida Avenue, Tampa, Florida. If Govoni continues to be in contempt, the Court will consider further sanctions.

(5) The Trustee's second Emergency Motion for Sanctions (Doc. 113) is **GRANTED**. Govoni is ordered to pay for and to cooperate in the reinstatement of any of the dissolved Alter Ego Entities that the Trustee directs him to reinstate.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).